IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MACRO CONCEPT, LLC,** *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civ. No. DLB-22-496 |
| **DECARO & HOWELL, P.C.,** *et al.*, | * | |
| Defendants. | * | |
| | * * * * | |
| **ABIMBOLA DARAMOLA,** *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civ. No. DLB-22-498 |
| **DECARO & HOWELL, P.C.,** *et al.*, | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Plaintiffs Abimbola Daramola, Gbamgbade E. Daramola, and Olaide Daramola, and their companies Macro Concept, LLC ("Macro") and Grace Solutions, LLC ("Grace"), filed suit against the law firm of DeCaro & Howell, P.C. and attorneys Marla L. Howell and Thomas F. DeCaro, Jr. in two separate but nearly identical actions. In No. DLB-22-496, Macro and Grace are the plaintiffs. In No. DLB-22-498, the Daramolas are the plaintiffs. Each suit involves the same legal claims and, generally, the same allegations. The plaintiffs allege they hired the defendants to provide legal representation for the negotiation of a refinancing loan agreement and that the defendants' racially motivated, deficient representation caused them to suffer significant financial harm. ECF 1 in Nos. DLB-22-496 & DLB-22-498. The plaintiffs claim discrimination based on race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count I); negligence and legal

malpractice (Count II); gross negligence (Count III); and fraud and false representation (Count IV). *Id.* The defendants move to dismiss both complaints for identical reasons. ECF 21 in No. DLB-22-496; ECF 17 in No. DLB-22-498. They argue that the plaintiffs fail to allege race discrimination and that all the claims accrued more than a decade ago and are barred by the statute of limitations. *Id.* The motions are fully briefed. ECF 26 & 28 in No. DLB-22-496; ECF 21 & 22 in No. DLB-22-498. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the motions to dismiss are granted, and the complaints are dismissed.

## I. Background

Macro and Grace are limited liability companies with offices in Laurel, Maryland. ECF 1 in No. DLB-22-496, ¶¶ 6–7. The Daramolas—mother Abimbola, father Gbamgbade, and daughter Olaide—are the current and founding members of both companies. ECF 1 in No. DLB-22-498, ¶ 17. They are of African descent and identify as African Americans. *Id.* The Daramolas organized Macro and Grace to provide consulting services and manage, hold, and invest in real estate. ECF 1 in No. DLB-22-496, ¶ 11. In the late 1990s and early 2000s, the companies acquired various properties in Baltimore and Gwynn Oak, Maryland. ECF 1 in No. DLB-22-498, ¶ 19. The companies owned the structures on the properties but not the land. *Id.* ¶ 20. Abimbola and Gbamgbade additionally acquired two properties in their own name. *Id.* ¶ 18. The plaintiffs constructed and operated gas stations and convenience stores on these properties, as well as one strip mall. ECF 1 in No. DLB-22-496, ¶¶ 12–17. Macro and Grace borrowed money from Potomac Valley Bank, the predecessor in interest to PNC Bank, to acquire the properties and build on them; only two properties, Reisterstown Citgo and Liberty Citgo, were owned debt free. ECF 1 in No. DLB-22-498, ¶ 27. The total amount of the loans was approximately $4,250,000. *Id.* ¶ 30.

Gbamgbade, who was in charge of the day-to-day operations of the companies, suffered a stroke in early 2009. ECF 1 in No. DLB-22-496, ¶¶ 18–19. He became unable to continue managing the businesses, and as a consequence, Macro and Grace defaulted on their loans. *Id.* ¶¶ 19–20. As of March 2009, the total debt had reached approximately $4,880,118. *Id.* ¶ 20. The companies initially sought refinancing with PNC Bank, but they found the proposed terms onerous and decided to look elsewhere. *Id.* ¶ 21. In the meantime, they filed for bankruptcy under Chapter 11. *Id.* ¶ 22. Eventually, they turned for help to their longtime business partner, fuel supplier Carroll Independent Fuel Company ("Carroll"). *Id.* ¶ 23. The proposed deal with Carroll included the creation of a new entity, HJR Benson Loan Docs, LLC ("HJR Benson"), to acquire the PNC loans; management of the properties by Carroll; the payment of monthly mortgages to HJR Benson; the remission of excess revenues to Macro and Grace; and the provision of quarterly reports on business activities. *Id.* ¶ 24. The properties, including one owned by the Daramolas as individuals, would be collateral for the new loans. *Id.*; ECF 1 in No. DLB-22-498, ¶ 44.

The plaintiffs retained the law firm DeCaro & Howell, P.C. as counsel during the negotiation of the agreement with Carroll. ECF 1 in No. DLB-22-498, ¶¶ 40–41. The firm's practice includes real estate and financing transactions and contract negotiations. *Id.* ¶ 9. At the time, the plaintiffs had an ongoing attorney–client relationship with the firm. ECF 1 in No. DLB-22-496, ¶ 25. The firm "would advise the Daramolas on every aspect of their business ventures." ECF 1 in No. DLB-498, ¶ 56. DeCaro and Howell, the firm's named partners, undertook the remainder of the refinancing negotiations, with Howell taking the lead and DeCaro in a secondary role. ECF 1 in No. DLB-22-496, ¶ 26. Negotiations resulted in the creation of a memorandum of terms (the "Term Sheet"). *Id.* ¶ 27. The Term Sheet, which stated its terms were non-negotiable, provided for an interest rate of 6 percent for the first five years, changing to the London Interbank

Offered Rate ("LIBOR") plus 5.5 percent thereafter. *Id.* ¶ 28. On the advice and counsel of the defendants, the plaintiffs executed the Term Sheet in May 2009 with the understanding that new promissory notes and leases would be prepared consistent with its terms. *Id.* ¶ 29.

The closing on the transaction was scheduled for September 11, 2009 at the Law Offices of Ober Kaler. *Id.* ¶ 32. Attorneys for HJR Benson and Carroll prepared the drafts of the transaction documents, including promissory notes, deeds of trust, and leases, and sent them to the defendants for review. *Id.* ¶ 31. Part of the defendants' representation included the agreement to review all transaction documents to ensure they reflected the Term Sheet and to represent the plaintiffs at the closing. *Id.* ¶ 30. Howell informed the plaintiffs of the date, time, and location of the closing, and stated she would attend. *Id.* ¶ 33. Fifteen minutes after the scheduled start of the meeting, Howell had not arrived; the other parties' counsel called her, and she said she was stuck in traffic. *Id.* ¶ 35. Eventually, she informed the plaintiffs over the phone that she would not be attending. *Id.* ¶ 36. When the plaintiffs grew concerned and wanted to reschedule the closing, counsel for HJR Benson and Carroll informed them it was a take-it-or-leave-it deal. ECF 1 in No. DLB-22-498, ¶ 74. Over the phone, Howell assured the plaintiffs that she had reviewed the transaction documents and that the documents reflected the deal set forth in the Term Sheet. ECF 1 in No. DLB-22-496, ¶ 38. She advised them that it was a good deal and their only option, so they should sign the documents in her absence. *Id.* The plaintiffs heeded her advice and, over the next five hours, signed the transaction documents. *Id.* ¶ 39. They did not receive copies of the documents they signed. *Id.*

The terms of the agreement the plaintiffs agreed to on September 11 did not reflect the terms in the Term Sheet. *Id.* ¶ 47. The changes included a floor for the LIBOR of 3 percent (the actual LIBOR during this period was under 1 percent); an added default interest rate of 2 percent;

and late fees of 5 percent per month. *Id.* After the five-year initial interest period ended and the rates ballooned in 2016, HJR Benson declared Macro and Grace in default and initiated foreclosure proceedings. *Id.* ¶¶ 44–45. Despite requests from the plaintiffs, HJR Benson never provided monthly billings, accounting statements, or notices that arrearages were piling up. ECF 1 in No. DLB-22-498, ¶¶ 87–89. Likewise, despite the plaintiffs repeated requests, the defendants never provided the plaintiffs with reports about the status of the operations of the gas stations. ECF 1 in No. DLB-22-496, ¶ 42.

In response to the default, Macro and Grace again filed for Chapter 11 bankruptcy. *Id.* ¶ 45. HJR Benson filed a proof of claim asserting that the loan balances had increased to $5,423,041. *Id.* ¶ 46. During the bankruptcy litigation, the plaintiffs discovered the changes to the interest rates in the final agreement. *Id.* ¶ 47. They filed objections to HJR Benson's proof of claim. *Id.* ¶ 50. At an evidentiary hearing on April 12, 2019, DeCaro testified that he was in bankruptcy court the morning of the closing and that the closing was not on the firm's calendars. *Id.* ¶ 57. He never reviewed the promissory notes at issue. *Id.* Howell also testified. *Id.* ¶ 51. She stated she did not attend the closing due to a conflict. *Id.* She never informed the plaintiffs about the conflict or attempted to reschedule the closing. *Id.* She additionally admitted that she had not reviewed the transaction documents presented at the closing despite advising the plaintiffs over the phone that she had and that they should proceed in her absence. *Id.* ¶ 52. When asked directly whether she had read the notes, she responded that "it is what it is." ECF 1 in No. DLB-22-498, ¶ 110. Other evidence at the hearing included emails between Howell and counsel for HJR Benson in the weeks following the September 11 meeting indicating that the transaction was not actually finalized on that date. ECF 1 in No. DLB-22-496, ¶ 53. One email included clean and marked-up copies of the transaction documents and requested the defendants issue an opinion

5

letter approving the transaction. *Id.* ¶ 55. This email specifically referred to the interest rate change. *Id.* The defendants issued the requested opinion letter on September 17, in which they stated they had reviewed and approved the transaction documents. *Id.* ¶ 56. Neither DeCaro nor Howell communicated with HJR Benson or Carroll to obtain accounting or other financial records, and neither advised the plaintiffs on any course of action to gain compliance with the loan terms. *Id.* ¶ 58.

The bankruptcy court declined to confirm a Chapter 11 plan for Macro and Grace and dismissed the petitions. *Id.* ¶ 61. On November 1, 2019, one of Macro and Grace's loans matured and became due and payable. *Id.* ¶ 64. Macro and Grace could not pay the amount, which had increased nearly $600,000 over the 10 years. *Id.* ¶¶ 64–65. The default triggered cross-collaterization and cross-default provisions in the other promissory notes, and on May 14, 2021, HJR Benson notified Macro and Grace of the default of all their notes with outstanding aggregate debt of $5.8 million. *Id.* ¶¶ 65–66. Three of Macro and Grace's properties were sold at auction on August 26, 2021. *Id.* ¶ 68. Additionally, the two properties owned by the plaintiffs without debt were lost immediately after the signing of the September 11, 2009 agreement. ECF 1 in No. DLB-22-498, ¶ 95. The Daramolas eventually took out a second mortgage on their family home to cover their financial obligations. *Id.* ¶ 94.

## II.     Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible

claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court does not "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

**III.   Discussion**

The defendants argue all the plaintiffs' claims are time-barred because they accrued in 2009. They additionally argue the plaintiffs do not plausibly allege a § 1981 claim, the only basis for federal jurisdiction. The Court agrees that the plaintiffs fail to allege facts plausibly supporting an inference of racial discrimination, as required to assert a § 1981 claim. The Court declines to

exercise supplemental jurisdiction over the remaining state law claims and, therefore, does not reach the statute of limitations question.

### A. Section 1981 Race Discrimination

"Congress passed § 1981 to guarantee[] to all persons in the United States the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (quoting *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1017 (4th Cir. 1999) (quoting 42 U.S.C. § 1981(a))) (internal quotation marks omitted). The statute "defines 'make and enforce contracts' as including the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (quoting 42 U.S.C. § 1981(b)). To state a cause of action under § 1981, a plaintiff who is a member of a racial minority "must allege facts that, if accepted as true, allow the court to draw a reasonable inference" that (1) "the defendant intended to discriminate on the basis of race"; (2) "the discrimination interfered with a contractual interest"; and (3) "the interference with a contractual interest would not have happened but for the plaintiff's race." *Id.* (internal quotation marks and citations omitted); *see also Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 734 (D. Md. 2001).

The plaintiffs, who are African Americans (or companies owned by African Americans), allege very troubling conduct by their former attorneys. For example, they allege the defendants failed to review transaction documents before the closing date, were absent from the closing meeting, and misrepresented that the transaction documents reflected the negotiated deal. ECF 1 in No. DLB-22-496, ¶ 73. However, they do not allege any facts supporting an inference that the defendants intended to discriminate against them based on their race. Apart from the conduct itself, the plaintiffs allege only that DeCaro allowed Howell to take the lead in the Carroll

transaction without supervising her work; that Howell displayed callous disregard about her conduct and its effect on the plaintiffs during her testimony at the bankruptcy hearing; and that the defendants "have fulfilled their legal representation obligations" for "similarly-situated Caucasian-owned businesses" by reviewing transaction documents and representing them at important meetings. *Id.* ¶¶ 73, 75–77.[1] These thin threads cannot be woven together into a plausible § 1981 claim. Any connection between the plaintiffs' race and DeCaro's hands-off approach or Howell's indifference is speculative.[2] None of their alleged acts or statements relates to race. If they had fulfilled their legal representation obligations for similarly situated Caucasian clients, that may have supported an inference of discrimination, but plaintiffs' allegations about Caucasian clients are conclusory and unsupported by specifics. The plaintiffs do not allege how the Caucasian clients are similarly situated to them, how many comparators there are, or when those clients received better treatment.

This case is analogous to *Nadendla*, 24 F.4th 299 (4th Cir. 2022). The plaintiff there alleged "extensive and specific" details regarding the defendant's conduct. *Id.* at 305. The plaintiff, a physician of Indian origin, alleged that the defendant hospital revoked her clinical privileges and, at an internal hearing, deprived her of adequate process in contravention of its bylaws. *Id.* at 302. The Fourth Circuit found that "factual details regarding race [were] conspicuously absent" from the plaintiff's complaint. *Id.* at 305. The plaintiff generally alleged that the hospital forced out other Indian physicians, treated her differently than similarly situated

---

[1] The plaintiffs' allegations on this point between the two complaints are identical. Indeed, despite the fact that the allegations in the complaints are phrased, framed, and numbered differently, the opposition in No. DLB-22-498 cites the complaint in No. DLB-22-496. *See* ECF 21 in No. DLB-22-498, at 17–18.

[2] The plaintiffs' conjecture is further undermined by the allegation that the defendants had represented them in previous transactions, apparently without incident. ECF 1 in No. DLB-22-496, ¶ 75; ECF 1 in No. DLB-22-498, ¶ 56.

Caucasian physicians, and scrutinized minority physicians more harshly through medical peer review. *Id.* However, she provided "no details about any of these conclusory allegations[,]" including any details about how Caucasian physicians were treated differently. *Id.* at 305–06. "Without factual detail," the Court was "unable to infer that [the defendant] intended to interfere with a contractual interest of [the plaintiff] on the basis of race." *Id.* at 306. It concluded that the plaintiff failed to meet the Rule 8 pleading standard. *Id.*

So too here. Because the plaintiffs offer only speculation and conclusory allegations, the Court cannot reasonably infer that the defendants intended to discriminate against them in the provision of legal services because of their race. As a result, they fail to state a claim under § 1981. *See id.* at 308; *see also Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 399–400 (4th Cir. 2021) (affirming dismissal of a § 1981 claim where the plaintiff offered only conclusory allegations and speculation). Count I is dismissed.

### B. Supplemental Jurisdiction

A federal court's supplemental jurisdiction is not extinguished as a matter of course when all pending federal claims are dismissed. *See* 28 U.S.C. § 1367; *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995). A court "may," however, "decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In those circumstances, whether to dismiss a claim is committed to the discretion of the trial court. *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353–57 (1988). Courts consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *See, e.g.*, *Tolliver v. Tandium Corp.*, No. ELH-21-1441, 2022 WL 80587, at *3–4 (D. Md. Jan. 7, 2022) (quoting *Carnegie-Mellon*, 484 U.S. at 350); *see also*

*Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) (noting courts should consider the *Carnegie-Mellon* factors although the case preceded the adoption of 28 U.S.C. § 1367(c)).

This Court routinely declines to exercise jurisdiction over state law claims if all federal claims have been dismissed. *See, e.g.*, *Tolliver*, 2022 WL 80587, at *4; *Conkel v. Family & Children's Servs.*, No. JKB-13-331, 2013 WL 2105854, at *1 (D. Md. May 13, 2013); *NRT Mid-Atl., LLC v. D'Ambrosia*, No. DKC-08-166, 2008 WL 11367473, at *1 (D. Md. Dec. 22, 2008). The Court sees no reason to depart from that approach here. The remaining claims raise only questions of state law, which turn on an interpretation of the Maryland discovery rule and statute of limitations. Principles of comity thus support dismissal. Moreover, dismissal will not alter the parties' standing with regard to the statute of limitations, since the limitations period for claims brought in federal court pursuant to supplemental jurisdiction "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see also Turner v. Kight*, 957 A.2d 984, 996 (Md. 2008) (holding that, under § 1367(d), "[u]pon entry of the District Court judgment . . . the plaintiff will have whatever time that remained when the claims were filed with the District Court plus 30 days in which to file the State court action"). Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining claims.

IV.   **Conclusion**

The plaintiffs do not state a claim under § 1981. The Court declines to retain supplemental jurisdiction over the remaining state law claims. Both complaints are dismissed without prejudice.

Date: November 9, 2022

_____
Deborah L. Boardman
United States District Judge

11